**IDAHO COALITION UNITED FOR BEARS, a political committee; Lynn Fritchman, an individual; Don Morgan, an individual; Ronald D. Rankin, an individual; Initiative and Referendum Institute, a not-for-profit corporation, Plaintiffs–Appellees,**

v.

**Pete T. CENARRUSSA, in his official capacity as Secretary of State for the State of Idaho, Defendant–Appellant.**

No. 02–35030.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 7, 2003.

Filed Sept. 8, 2003.

**1074**

Brian P. Kane, Deputy Attorney General, and Alan G. Lance, Attorney General, Boise, ID, for defendant-appellant.

Paul Grant, Englewood, CO, for plaintiff-appellees.

Christopher Troupis, Troupis and Summer, Merididan, ID, for plaintiff-appellees.

Before REINHARDT, W. FLETCHER, and GOULD, Circuit Judges.

## OPINION

REINHARDT, Circuit Judge.

Idaho permits direct legislation through ballot initiatives. In order to appear on the ballot, an initiative must meet several conditions; one is that signatures in support of the initiative must be collected from six percent of the qualified voters in each of at least half of the state's counties. Because Idaho's counties vary widely in population, this geographic distribution requirement favors residents of sparsely populated areas over residents of more densely populated areas in their respective efforts to participate in the process of qualifying initiatives for the ballot. The district court held that this unequal treatment violates the Equal Protection Clause of the Fourteenth Amendment. We affirm.

## Background

The Idaho Constitution allows citizens to make laws directly through initiatives placed on election ballots.[1] The Idaho Legislature has enacted enabling legislation that defines Idaho's procedures for conducting initiative and referendum elections.[2]

Plaintiff Idaho Coalition United for Bears is an organization that seeks to advance its supporters' goals through the initiative process. Plaintiffs also include the Initiative and Referendum Institute, a group that seeks to further the rights of

---

1. The Idaho Constitution provides as follows:

   The people reserve to themselves the power to propose laws and enact the same at the polls independent of the legislature. This power is known as the initiative, and legal voters may under such conditions and in such manner as may be provided by acts of the legislature, initiate any desired legislation and cause the same to be submitted to the vote of the people at a general election for their approval or rejection.
   Idaho Const., art. III, § 1.

2. In order to begin the initiative process, a proponent prepares an initiative and collects twenty signatures. Idaho Code § 34–1804. The proposed initiative is then delivered to the Secretary of State, who immediately transmits it to the Attorney General's Office. *Id.* The Attorney General's office conducts a review of the measure for matters of substantive import, form, and style, and issues a certificate of review. Idaho Code § 34–1809.

The certificate of review must be issued whether or not the petitioner accepts or rejects the recommendations of the Attorney General in whole or in part. *Id.* Following issuance of the certificate of review, the petitioner may ask, within 15 working days, for the preparation of long and short titles. *Id.* Within ten days after receiving copies of the initiative for preparation of the ballot titles, the Attorney General must prepare both long and short titles. *Id.* Once the ballot titles are prepared, the petition sheets can be prepared by the petitioners with the short ballot titles affixed to the bottom of each page of the petition. *Id.* Petitioners are then free to circulate the petition. According to the law, petitioners may circulate an initiative for eighteen months following the issuance of the ballot titles. Idaho Code § 34–1802. Petitions are due at the expiration of eighteen months or on the last day of April in the year in which the proposed initiative would appear on the ballot. *Id.*

citizens to participate in the initiative process, and three individuals who have organized petition drives in attempts to place initiatives on the ballot in past years. We refer to the plaintiffs collectively as "the Coalition." The Coalition sued Idaho Secretary of State Pete T. Cenarrusa ("Idaho"), challenging Idaho Code section 34–1805, which requires petition sponsors to obtain signatures of six percent of the qualified voters in the state as a whole, including six percent of the qualified voters in each of at least half of Idaho's 44 counties.[3] *Idaho Coalition United for Bears v. Cenarrusa*, 234 F.Supp.2d 1159, 1160 (D.Idaho 2001).

Idaho's population is unevenly distributed throughout its counties: 60% of its population resides in just nine of its 44 counties.[4] For this reason, prior to the enactment of the challenged provision, initiative sponsors generally collected the vast majority of their signatures in the most heavily populated counties. Idaho's multi-county signature requirement was designed to ensure a wider distribution of signatures. The Coalition argues, however, that the new requirement makes it nearly impossible for all but the richest of initiative proponents to qualify initiatives for the ballot and that it favors voters in sparsely populated areas over those in more densely populated areas.

As the district court noted, even if three quarters of Idaho's citizens signed a petition, the measure could still fail to qualify for the ballot because the proponents failed to collect signatures from six percent of the registered voters in at least 22 separate counties. The court granted summary judgment in favor of the Coalition, holding that section 34–1805 violates the Equal Protection Clause by giving preferential treatment to residents of sparsely populated counties. Idaho appeals.[5]

---

**3.** Section 34–1805 provides in full as follows:

After the form of the initiative or referendum petition has been approved by the secretary of state as in sections 34–1801A through 34–1822, Idaho Code, provided, the same shall be printed by the person or persons or organization or organizations under whose authority the measure is to be referred or initiated and circulated in the several counties of the state for the signatures of legal voters. Before such petitions shall be entitled to final filing and consideration by the secretary of state there shall be affixed thereto the signatures of legal voters equal in number to not less than six percent (6%) of the qualified electors of the state at the time of the last general election. Provided that the petition must contain a number of signatures of qualified electors from each of twenty-two (22) counties equal to not less than six percent (6%) of the qualified electors at the time of the last general election in each of those twenty-two (22) counties.

Idaho Code § 34–1805. This section was enacted in 1997, along with other amendments

to Idaho's procedures for conducting initiative and referendum elections.

**4.** Details concerning the population of the various counties are available on the United States Census web site. *See* Census 2000 Data for the State of Idaho, *at* http://www.census.gov/census2000/ states/ id.html. As of the last census, 300,904 people lived in Ada, Idaho's most populous county, while the least populous county, Clark, was home to only 1022 people. *Id.*

**5.** The Coalition also challenged the requirement of Idaho Code section 34–1807 that only Idaho residents may circulate petitions; the criminalization in Idaho Code section 34–1815 of willful and knowing publication or exhibition of false statements concerning the contents, purport or effect of a petition; and the criminalization of "collecting petitions for hire" contained in Idaho Code section 34–1821(a). The district court upheld section 34–1807 but invalidated sections 34–1805, 34–1815, and 34–1821(a). 234 F.Supp.2d 1159, 1167–68. Only section 34–1805 is at issue on appeal.

### Analysis

▇▇▇▇ Voting is a fundamental right subject to equal protection guarantees under the Fourteenth Amendment. *See Reynolds v. Sims,* 377 U.S. 533, 561–62, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society."). The ballot initiative, like the election of public officials, is a " 'basic instrument of democratic government,'" *Cuyahoga Falls v. Buckeye Comm. Hope Found.,* — U.S. —, 123 S.Ct. 1389, 1395, 155 L.Ed.2d 349 (2003) (quoting *Eastlake v. Forest City Enters., Inc.,* 426 U.S. 668, 679, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976)), and is therefore subject to equal protection guarantees. Those guarantees furthermore apply to ballot access restrictions just as they do to elections themselves. *See Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979).[6]

The question of the constitutionality of Idaho's requirement that in order to qualify an initiative petitions must be signed by a fixed percentage of voters from each of 22 of the state's 44 counties—counties which vary drastically in the size of their population—is controlled by *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). The *Moore* Court addressed an Illinois statute governing the nomination of newly formed political parties' candidates to be electors of President and Vice President of the United States. *Moore,* 394 U.S. at 818, 89 S.Ct. 1493. The statute provided for a nominating process requiring each candidate to collect at least 25,000 signatures, including " 'signatures of 200 qualified voters from each of at least 50' " of the state's 102 counties. *Id.* at 815, 89 S.Ct. 1493(quoting Ill.Rev.Stat., chap. 46

§ 10–3 (1967)). The asserted purpose of the law was "to require statewide support for launching a new political party rather than support from a few localities." *Id.* at 818, 89 S.Ct. 1493.

The constitutional flaw in the Illinois geographic distribution requirement was that, although the counties were of widely unequal population, the same "rigid, arbitrary formula" was applied to all of them. *Id.* The *Moore* Court held that the distribution requirement violated the one person, one vote principle of *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), and *Reynolds,* a principle at the core of the fundamental right to vote. *Moore,* 394 U.S. at 819, 89 S.Ct. 1493("The idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government."). In *Sanders,* the Court invalidated Georgia's "county unit" system for nominating party candidates for United States Senator in primary elections. *See* 372 U.S. at 371, 83 S.Ct. 801. Under that system, each county was entitled to a certain number of "county unit" votes, all of which would be cast for the candidate for nomination who received the greatest number of popular votes in that county. *Id.* The candidate who received the greatest total number of county unit votes would become the nominee. *Id.* The system violated the one person, one vote principle because the populations of the various counties were not in proportion to the number of county unit votes to which the counties were entitled. *Id.* In *Reynolds,* the Court invalidated an Alabama legislative apportionment scheme, under which counties of unequal population were represented in equal numbers in the state legislature. *Reynolds,* 377 U.S. at 540, 84

---

**6.** We note that state requirements for certifying ballot initiatives also implicate the free speech right and are subject to equal protec-

tion guarantees for that reason as well. *See Meyer v. Grant,* 486 U.S. 414, 421–22, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988).

S.Ct. 1362. In both cases, the votes cast by voters residing in the counties with larger population had less effect than the votes of those who lived in more sparsely populated rural areas.

■ *Moore* extended the principle of *Sanders* and *Reynolds*, which involved voting, to the collection of signatures on nominating petitions. Although *Moore* does not specifically discuss the applicable level of scrutiny, it is evident that under *Moore* strict scrutiny applies to state laws treating nomination signatures unequally on the basis of geography.

■ The district court perceived no material difference between the Illinois petition requirement invalidated in *Moore* and the requirement at issue in the present case, and we agree that there is none. Even the suggested purpose of the two requirements—to ensure that all options presented on the ballot command at least a modicum of statewide support—is the same. Idaho argues that the distinction between requiring sufficient voter support of candidates (as did the Illinois provision) and requiring such support for voter initiatives (as does the Idaho statute) is legally dispositive. Idaho believes that this difference is decisive because, the state asserts,

the sort of candidate signature requirements at issue in *Moore* "may or may not directly impact the entire state but the direct legislation directly involves the entire state of Idaho." The state interest in "protecting the entire state from localized legislation," Idaho argues, is therefore greater than the state interest furthered by the law invalidated in *Moore*. As noted above, however, the plaintiffs in *Moore* were candidates for the offices of electors of President and Vice President of the United States from the state of Illinois. *Moore*, 394 U.S. at 815, 89 S.Ct. 1493. In our view, the question whether a new political party may place its presidential electors on the statewide presidential ballot represents at least as significant a matter of statewide concern as whether ballot initiatives may qualify. Idaho does not explain how it reaches the opposite conclusion. We therefore reject its proffered distinction as immaterial.[7] Nominating petitions for candidates and for initiatives both implicate the fundamental right to vote, for the same reasons and in the same manner, and the burdens on both are subject to the same analysis under the Equal Protection Clause.

A more plausible distinction between *Moore* and the case before us is that,

---

7. One case cited by Idaho does support the materiality of the distinction between candidates and initiatives. The Supreme Judicial Court of Massachusetts, in upholding a petitioning requirement similar to section 34–1805, distinguished *Moore* on the basis that *Moore* "appears to rest primarily on the interest of qualified voters in voting for representatives of their choice," an interest that "would not be served by applying strict scrutiny . . . where no representation is involved." *Massachusetts Public Interest Research Group v. Sec'y of the Commonwealth*, 375 Mass. 85, 375 N.E.2d 1175, 1182 (1978) (*MassPIRG* ). The *MassPIRG* court concluded that, whereas ballot access for representatives implicates the fundamental right to vote, access for initiatives does not, because no right to participate in direct legislation is " 'explicitly or

implicitly guaranteed by the Constitution.' " *Id.* (quoting *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 33–34, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)). We respectfully disagree, however, because when a state chooses to grant the right to vote in a particular form, it subjects itself to the requirements of the Equal Protection Clause. *See Bush v. Gore*, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). Indeed, the very right at issue in *Moore*, the right to vote for electors for President and Vice President, is granted by the state, not by the federal Constitution. *Bush*, 531 U.S. at 104, 121 S.Ct. 525. Thus, while a state may decline to grant a right to legislate through ballot initiatives, it may not grant that right on a discriminatory basis. *MassPIRG* was, therefore, not decided correctly.

whereas the Illinois law in *Moore* required the same *number* of signatures (200) regardless of a county's population, the Idaho law requires a fixed *percentage* (six percent) of a county's population. The *Moore* Court asserted that the Illinois law applied a "rigid, arbitrary formula." *Moore*, 394 U.S. at 818, 89 S.Ct. 1493. If the Court's objection to the formula were merely that 200 constituted a higher percentage of the population in some counties than in others, then *Moore* would be distinguishable from the present case.

We reject the argument, however, that the difference between percentages and absolute numbers serves to distinguish *Moore*. In fact, the violation here appears to be more egregious than the violation proscribed in *Moore*. At least in *Moore* the vote of every person who "voted" by signing a petition counted as long as 199 other persons also signed. Here, in the smallest county a "vote" may count where 61 others sign, whereas in the largest county it may require up to 18,054 other signatures before the individual's "vote" will count. Both the Idaho and the Illinois requirements violate the Equal Protection Clause, because they allocate equal power to counties of unequal population. Because some of Idaho's counties are far more heavily populated than others, an initiative that is popular primarily with voters in sparsely populated counties can reach the ballot with the support of many fewer voters than can an initiative that is popular primarily with voters in densely populated counties. Like the county unit system in *Sanders*, the Idaho system violates equal protection because the few voters in a sparsely populated county have a power equal to the vastly larger number of voters who reside in a populous county. In short, an electoral system, here the system governing the people's right to place initiative measures on the ballot, may not be based on treating unequal counties equally and making the electoral determination dependent on the support of numbers of counties rather than numbers of people.

Idaho's other arguments are unpersuasive. As discussed above, we reject its argument that there is "a far more compelling interest in requiring a modicum of statewide support in the direct legislation context as opposed to the formation of a third party." Even if Idaho's argument were correct, however, the Idaho distributional requirement is not narrowly tailored to further any such interest. Idaho could achieve the same end through a geographic distribution requirement that does not violate equal protection, for example, by basing any such requirement on existing state legislative districts.[8]

Quoting *The Federalist* No. 3, Idaho also argues that the geographic distribution requirement is part of a system of "checks and balances," which is especially important with regard to direct legislation, as a protection against the " 'confusion of the multitude.' " The requirement is analogous, Idaho argues, to several features of the federal system, including the electoral college, *see* U.S. Const. amend. XII, which permits the loser of the popular vote to assume the presidency, as occurred most recently in the 2000 election; the veto power of the President, *see id.* art. I, § 7, which can defeat legislation approved by a

---

8. Idaho argues that the challenged law is narrowly tailored because it includes, in addition to the distribution requirement, a requirement that an initiative receive signatures of six percent of the voters of the state as a whole. A similar state-wide requirement was not enough to save the statute in *Moore*, however, *see Moore*, 394 U.S. at 818, 89 S.Ct. 1493, and carries little weight here, given that the state could create a distributional requirement that would achieve the ostensible end without discriminating against voters in large counties.

majority of both houses of Congress; and the system of electing two members of the Senate from each state, *id.* § 3, which often prevents measures approved by representatives of a popular majority (in the House) from becoming law. Idaho's argument cannot succeed. Although the United States Constitution awards greater power to voters in less populous states than to those in more populous states through the Senate and the electoral college, it is well established that an analogous system on the part of the states is impermissible. *See Sanders,* 372 U.S. at 378, 83 S.Ct. 801 ("The inclusion of the electoral college in the Constitution, as the result of specific historical concerns, validated the collegiate principle despite its inherent numerical inequality, but implied nothing about the use of an analogous system by a State in a statewide election." (footnote omitted)). To the extent that Idaho wishes to create a check on the will of the majority by a *non* discriminatory means, the equal protection clause is no bar.[9] The state may not, however, weigh the votes (or signatures) of some voters more heavily than those of others.

Idaho also argues that the geographic distribution requirement furthers other valuable purposes, including preventing a long and confusing list of initiatives from appearing on the ballot, protecting against fraud, informing the electorate, ensuring the "integrity" of the ballot process, and promoting "grassroots direct legislation efforts." Assuming that these are all valid purposes advanced by the geographic distribution requirement, they nonetheless cannot save that requirement, because these purposes could be advanced as effectively and efficiently by another system that *would* treat voters residing in different geographic areas equally. For exam-

ple, most if not all of these objectives could be satisfied, even more readily, by simply increasing the statewide percentage of signatures required—from six to twelve percent or to any other percentage Idaho deemed desirable.

Idaho also cites three lower court decisions that it believes support its argument that its distribution requirement is constitutional. Two of them are readily distinguishable, because the distributional requirements they address pertain to districts of equal population. *See Libertarian Party v. Bond,* 764 F.2d 538 (8th Cir. 1985); *Udall v. Bowen,* 419 F.Supp. 746 (S.D.Ind.1976), *aff'd,* 425 U.S. 947, 96 S.Ct. 1720 (1976). The third, *MassPIRG,* which is discussed above, *see supra* footnote 7, is, as we explained, wrongly decided. *Cf. In re Berg,* 552 Pa. 126, 713 A.2d 1106, 1108 (1998) (upholding ballot-access requirement of 100 signatures from each of 10 of the state's 67 counties and, distinguishing *Moore* on the basis, among others, that Pennsylvania's counties were more evenly populated). We also note that the Supreme Court of Utah, relying on *Moore* and citing the opinion of the district court in the present case, has recently invalidated a Utah geographic distribution requirement quite similar to Idaho's. *See Gallivan v. Walker,* 54 P.3d 1069, 1094–95 (Utah 2002).

## Conclusion

Section 34–1805 violates the Equal Protection Clause. The decision of the district court is therefore

**AFFIRMED.**

---

**9.** Some restrictions are impermissible for other reasons, of course. *See, e.g., Meyer,* 486 U.S. at 415–16, 108 S.Ct. 1886 (invalidating under Free Speech Clause a Colorado law making it a felony to pay petition circulators).