**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ARIZONA DEMOCRATIC PARTY; DEMOCRATIC NATIONAL COMMITTEE; DSCC, *Plaintiffs-Appellees,* <br><br> v. <br><br> KATIE HOBBS, in her official capacity as Arizona Secretary of State, *Defendant-Appellee,* <br><br> STATE OF ARIZONA, *Intervenor-Defendant-Appellant,* <br><br> and <br><br> EDISON WAUNEKA, in his official capacity as Apache County Recorder; DAVID STEVENS, in his official capacity as Cochise County Recorder; PATTY HANSEN, in her official capacity as Coconino County Recorder; SADIE JO BINGHAM, in her official capacity as Gila County Recorder; WENDY JOHN, in her official capacity as Graham County Recorder; SHARIE MILHEIRO, in her official capacity as Greenlee County | No. 20-16759 <br><br> D.C. No. 2:20-cv-01143-DLR |

Recorder; RICHARD GARCIA, in his official capacity as La Paz County Recorder; ADRIAN FONTES, in his official capacity as Maricopa County Recorder; KRISTI BLAIR, in her official capacity as Mohave County Recorder; MICHAEL SAMPLE, in his official capacity as Navajo County Recorder; F. ANN RODRIGUEZ, in her official capacity as Pima County Recorder; VIRGINIA ROSS, in her official capacity as Pinal County Recorder; SUZANNE SAINZ, in her official capacity as Santa Cruz County Recorder; LESLIE HOFFMAN, in her official capacity as Yavapai County Recorder; ROBYN POUQUETTE, in her official capacity as Yuma County Recorder,

*Defendants,*

REPUBLICAN NATIONAL COMMITTEE; ARIZONA REPUBLICAN PARTY,

*Intervenor-Defendants.*

ARIZONA DEMOCRATIC PARTY;
DEMOCRATIC NATIONAL
COMMITTEE; DSCC,
   *Plaintiffs-Appellees,*

     v.

KATIE HOBBS, in her official
capacity as Arizona Secretary of
State,
    *Defendant-Appellee,*

REPUBLICAN NATIONAL COMMITTEE;
ARIZONA REPUBLICAN PARTY,
 *Intervenor-Defendants-Appellants,*

    and

EDISON WAUNEKA, in his official
capacity as Apache County
Recorder; DAVID STEVENS, in his
official capacity as Cochise County
Recorder; PATTY HANSEN, in her
official capacity as Coconino County
Recorder; SADIE JO BINGHAM, in her
official capacity as Gila County
Recorder; WENDY JOHN, in her
official capacity as Graham County
Recorder; SHARIE MILHEIRO, in her
official capacity as Greenlee County
Recorder; RICHARD GARCIA, in his
official capacity as La Paz County
Recorder; ADRIAN FONTES, in his
official capacity as Maricopa County

No. 20-16766

D.C. No.
2:20-cv-01143-
DLR

OPINION

Recorder; KRISTI BLAIR, in her official capacity as Mohave County Recorder; MICHAEL SAMPLE, in his official capacity as Navajo County Recorder; F. ANN RODRIGUEZ, in her official capacity as Pima County Recorder; VIRGINIA ROSS, in her official capacity as Pinal County Recorder; SUZANNE SAINZ, in her official capacity as Santa Cruz County Recorder; LESLIE HOFFMAN, in her official capacity as Yavapai County Recorder; ROBYN POUQUETTE, in her official capacity as Yuma County Recorder,
*Defendants,*

STATE OF ARIZONA,
*Intervenor-Defendant.*

Appeal from the United States District Court
for the District of Arizona
Douglas L. Rayes, District Judge, Presiding

Argued and Submitted July 7, 2021
San Francisco, California

Filed December 8, 2021

Before:  A. Wallace Tashima and Susan P. Graber, Circuit Judges, and Kathryn H. Vratil,[*] District Judge.

Opinion by Judge Graber;
Dissent by Judge Tashima

---

## SUMMARY[**]

---

### Voting Rights

The panel vacated a permanent injunction entered by the district court, and remanded with instructions to enter judgment in favor of defendant Arizona officials, in an action brought by Democratic Party organizations challenging the election-day deadline for voters who neglect to sign the vote by mail ballot affidavit as a violation of the First and Fourteenth Amendments and as a denial of procedural due process.

Arizona voters may vote by mail during the last four weeks of an election.  To vote by mail, a voter must return a completed ballot in a specially provided, postage-paid envelope, and the voter must sign an affidavit that is printed on the envelope.  A ballot with a missing signature is incomplete and cannot be counted.  A voter may correct a ballot with a missing signature by submitting a signed replacement ballot by the election-day deadline.  Arizona

---

[*] The Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

voters may verify a mismatched signature for three or five days after election day, but voters may correct a missing signature by election day at the latest.

The panel held that, under the framework articulated by *Anderson v. Celebrezze*, 460 U.S. 428 (1983), and *Burdick v. Takushi*. 504 U.S. 428 (1992) (the "*Anderson/Burdick* framework"), the State had an important regulatory interest in reducing the administrative burden on poll workers, especially during the busy days immediately following an election. In light of the minimal burden on the voter to sign the affidavit or to correct a missing signature by election day, the State's interest sufficiently justified the election-day deadline. The panel held further that although Arizona's law implicated national interests, at least when the election included presidential candidates, that factor alone did not mean that the burden was more than minimal or that strict scrutiny must apply. In addition, the State rationally distinguished between voters who neglect to sign the affidavit, thereby submitting an incomplete ballot, and voters who validly submit a completed, not-yet-verified, ballot.

The panel held that the *Anderson/Burdick* framework applied equally to Plaintiffs' procedural due process claim, and that claim also failed.

The panel concluded that the Arizona legislature laudably amended its election code in 2019 to allow voters an extended period to correct mismatched signatures, and Arizona's decision not to grant the same extension to voters who neglect to sign the affidavit passed constitutional muster.

Judge Tashima dissented, and would affirm the district court, whose decision to grant the injunction was considered

and supported by substantial evidence in the record. He would hold that the State offered no rational explanation for requiring ballots missing signatures to be cured by election day, given the five-day post-election cure period for correcting other similar mistakes.

**COUNSEL**

Drew C. Ensign (argued) and Michael S. Catlett, Deputy Solicitors General; Jennifer J. Wright and Robert J. Makar, Assistant Attorneys General; Brunn W. Roysden III, Solicitor General; Joseph A. Kanefield, Chief Deputy & Chief of Staff; Mark Brnovich, Attorney General; Office of the Attorney General, Phoenix, Arizona; for Intervenor-Defendant-Appellant State of Arizona.

Daniel Shapiro (argued), Thomas McCarthy, and Cameron T. Norris, Consovoy McCarthy PLLC, Arlington, Virginia; Patrick N. Strawbridge, Consovoy McCarthy PLLC, Boston, Massachusetts; Kory A. Langhofer and Thomas J. Basile, Statecraft PLLC, Phoenix, Arizona; for Intervenor-Defendants-Appellants Republican National Committee and Arizona Republican Party.

Elisabeth C. Frost (argued), Marc E. Elias and Jyoti Jasrasaria, Perkins Coie LLP, Washington, D.C.; Kevin Hamilton and William B. Stafford, Perkins Coie LLP, Seattle, Washington; for Plaintiffs-Appellees.

Andrew G. Pappas, General Counsel, Arizona House of Representatives, Phoenix, Arizona; Gregrey G. Jernigan, General Counsel, Arizona State Senate, Phoenix, Arizona; for Amici Curiae Russell Bowers Speaker of the Arizona House of Representatives, and Karen Fann President of the Arizona State Senate.

Edmund G. LaCour Jr., Solicitor General; Steve Marshall, Attorney General; A. Barrett Bowdre, Deputy Solicitor General; Office of the Attorney General, Montgomery, Alabama; Leslie Rutledge, Attorney General, Little Rock, Arkansas; Christopher M. Carr, Attorney General, Atlanta,

Georgia; Lawrence G. Wasden, Attorney General, Boise, Idaho; Curtis T. Hill Jr., Attorney General, Indianapolis, Indiana; Derek Schmidt, Attorney General, Topeka, Kansas; Daniel Cameron, Attorney General, Frankfort, Kentucky; Jeff Landry, Attorney General, Baton Rouge, Louisiana; Lynn Fitch, Attorney General, Jackson, Mississippi; Eric S. Schmitt, Attorney General, Jefferson City, Missouri; Tim Fox, Attorney General, Helena, Montana; Douglas J. Peterson, Attorney General, Lincoln, Nebraska; Dave Yost, Attorney General, Columbus, Ohio; Mike Hunter, Attorney General, Oklahoma City, Oklahoma; Alan Wilson, Attorney General, Columbia, South Carolina; Jason Ravnsborg, Attorney General, Pierre, South Dakota; Herbert Slatery III, Attorney General, Nashville, Tennessee; Ken Paxton, Attorney General, Austin, Texas; Sean D. Reyes, Attorney General, Salt Lake City, Utah; Patrick Morrisey, Attorney General, Charleston, West Virginia; for Amici Curiae States of Alabama, Arkansas, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and West Virginia.

Jason Torchinsky, Dallin B. Holt, and Kenneth C. Daines, Holtzman Vogel Baran Torchinsky & Josefiak PLLC, Haymarket, Virginia, for Amicus Curiae Honest Elections Project.

**OPINION**

GRABER, Circuit Judge:

Most of Arizona's voters choose to vote by mail, which requires the voter to complete a ballot and sign an affidavit attesting that the voter personally has cast the ballot. Inevitably, a small number of voters neglect to sign the affidavit. Election officials scrupulously examine each affidavit to ensure that it is signed and, if the signature is missing, they notify the voter that the unsigned ballot is invalid and that the voter may cast a replacement or provisional ballot. Arizona long has allowed voters to correct a missing signature by casting a replacement or provisional ballot, provided that the voter does so by the election-day deadline.

Plaintiffs Arizona Democratic Party, Democratic National Committee, and Democratic Senatorial Campaign Committee brought this action, challenging the election-day deadline for voters who neglect to sign the affidavit as a violation of the First and Fourteenth Amendments and as a denial of procedural due process. The district court agreed with Plaintiffs and permanently enjoined Defendants Secretary of State Katie Hobbs and the County Recorders for all of Arizona's counties, requiring Defendants to extend the deadline by three or five days, depending on the type of election. We disagree. We first hold that, under the framework articulated by *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), known as the "*Anderson/Burdick* framework," the State has an important regulatory interest in reducing the administrative burden on poll workers, especially during the busy days immediately following an election. In light of the minimal burden on the voter to sign the affidavit or to correct a missing signature by election day, the State's interest

sufficiently justifies the election-day deadline. We next hold that the *Anderson*/*Burdick* framework applies equally to Plaintiffs' procedural due process claim and that, accordingly, that claim also fails. We vacate the injunction and remand with the instruction that the court enter judgment for Defendants.

## FACTUAL AND PROCEDURAL HISTORY

Arizona implemented early voting in 1925 but limited eligibility to only some voters. *Sherman v. City of Tempe*, 45 P.3d 336, 340 (Ariz. 2002) (citing 1925 Ariz. Sess. Laws, ch. 75 § 1). Beginning in 1991, all of Arizona's voters, not only those who swore that they would be absent on election day, could register to vote by mail. 1991 Ariz. Sess. Laws, ch. 51, § 1.

Today, Arizona's voters may vote by mail during the last four weeks of an election. Ariz. Rev. Stat. §§ 16-541(A), 16-542(C)–(D). Nearly four-fifths of Arizona's voters choose to vote by mail. To vote by mail, a voter must return a completed ballot in a specially provided, postage-paid envelope, and the voter must sign an affidavit that is printed on the envelope. Ariz. Rev. Stat. §§ 16-547, 16-548. The affiant declares, under penalty of perjury, that he or she "voted the enclosed ballot." *Id.* § 16-547(A). Both the ballot and the signed affidavit must be delivered to the office of the county recorder no later than 7:00 p.m. on election day. *Id.* § 16-547(C); § 16-548(A).

In recognition of the importance of a voter's signature, election officials strive to emphasize the signature requirement on the election materials themselves. For example, election officials in Maricopa County, the state's most populous county, use a variety of instructions and visual clues to direct the voter to the signature requirement. The back of the envelope contains the signature line in a clearly marked, prominent position:



The front of the envelope repeats the signature requirement:



And the instructions include the signature requirement in English, Spanish, and pictograph form:



A ballot with a missing signature is incomplete and cannot be counted. A voter may correct a ballot with a missing signature by submitting a signed replacement ballot. But the voter must do so by the election-day deadline. So far as the record in this case reveals, in the nearly century of early voting in Arizona, no county recorder ever has allowed a voter to correct a ballot with a missing signature after election day.[1] Arizona always has imposed the election-day deadline on voters to submit a signed ballot.

When election officials receive a ballot and a signed affidavit, the ballot is considered complete. Election officials then compare the signature on the affidavit with the signature in the voter's registration. Ariz. Rev. Stat. § 16-550(A). If the officials judge the signature as a match, then the ballot is counted. But if officials deem the signature a mismatch, then the ballot cannot be counted unless the voter verifies the signature.

Before 2019, counties adopted varying policies with respect to mismatched signatures. All counties allowed a voter to verify the authenticity of a ballot with a mismatched signature, but the counties imposed differing deadlines. Some counties allowed voters to correct a mismatched signature only through election day, and other counties allowed voters a few extra days past election day.

Following the 2018 election, the Navajo Nation and several individuals sued Secretary Hobbs and other election

---

[1] In response to interrogatories in this litigation, the County Recorder for Santa Cruz County stated that, in 2018, election officials in Santa Cruz County "mistakenly" gave voters several days after election day to correct a missing signature. But "no ballots were improperly counted as a result of this error because no voters cured their ballot after Election Day."

officials.  *Navajo Nation v. Hobbs*, No. 3:18-cv-08329 (D. Ariz.).  The plaintiffs alleged, among other things, that the patchwork approach for correcting mismatched signatures violated the constitutional rights of those persons residing in counties that imposed a stricter deadline.  In 2019, the Arizona legislature amended the election code to impose an explicit statewide requirement that, for mismatched signatures, county officials "shall allow signatures to be corrected not later than the fifth business day after a primary, general or special election that includes a federal office."  Ariz. Rev. Stat. § 16-550(A).  For elections without a federal office on the ballot, the statute allows a three-day grace period.  *Id.*  The legislative amendments did not address expressly how officials must handle ballots with a missing signature.

Arizona's Secretary of State drafts an "Election Procedures Manual" to meet her statutory requirement to "prescribe rules to achieve and maintain the maximum degree of correctness, impartiality, uniformity and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating and storing ballots."  Ariz. Rev. Stat. § 16-452(A).  For the manual to take effect, both the Governor and the Attorney General must approve it.  *Id.* § 16-452(B).  For the 2020 election, state law required the manual to be finalized no later than December 31, 2019.  *Id.*

In October 2019, Secretary Hobbs issued a draft manual that instructed election officials to permit voters, consistent with the 2019 legislative amendment, to verify a mismatched signature through election day plus five days.  The draft manual further instructed election officials to grant voters the extra five days also with respect to ballots with missing signatures.  The Attorney General agreed that ballots with

mismatched signatures may be corrected after election day, but he objected to the application of that extended deadline to ballots with missing signatures. In his view, Arizona law does not allow ballots with missing signatures to be corrected after election day.

Secretary Hobbs disagreed with the Attorney General's interpretation of state law,[2] but she agreed to change the manual in the interest of meeting the statutory deadline. With respect to ballots with missing signatures, the final version of the manual imposes the same election-day deadline that applied in earlier elections; after election day, voters may not correct a ballot with a missing signature. In sum, Arizona's voters may verify a mismatched signature for three or five days after election day, but voters may correct a missing signature by election day at the latest.

Pima County's procedures illustrate the differing treatment that election officials give to the two types of ballots. For mismatched signatures, election officials call the voter, who may confirm over the telephone that the signature is legitimate (or may request a replacement ballot if the signature is not legitimate). If election officials receive oral confirmation, they process the completed ballot along with all other valid ballots. For missing signatures, by contrast, election officials do not permit the voter to sign the original affidavit. Instead, officials send the voter a replacement ballot and a notification that the original ballot was rejected as incomplete. Or, if time is too short to mail a replacement ballot, officials notify the voter of the rejected,

---

[2] We agree with the district court that "[t]his dispute over state law is immaterial." *Ariz. Democratic Party v. Hobbs ("Hobbs I")*, 485 F. Supp. 3d 1073, 1082 n.5 (D. Ariz. 2020). At present, voters have until election day—and no later—to correct a ballot with a missing signature.

incomplete ballot and instruct the voter to vote in person at any walk-in early voting site, at an emergency voting location, or at the voter's assigned polling place on election day.

Arizona's system for allowing the correction of missing signatures falls in the middle of the spectrum of how other states handle ballots with missing signatures. Thirty-one states rely primarily on signature verification. Fifteen of those states—nearly half—do not require election officials to contact voters when they encounter a missing signature, effectively disallowing correction of a missing signature on any date. Four states, including Arizona, require officials to contact voters and permit correction through election day. The remaining twelve states require officials to contact voters and permit correction for varying durations beyond election day.

The dissenting opinion's suggestion that the election-day deadline for casting completed ballots by mail is part of "unprecedent assaults on voting rights" that have occurred in the past decade is, therefore, inaccurate. Dissent at 40–43. Arizona has followed the same procedure for nearly 100 years, and the challenged cure provision is more lenient than that of many other States.

In June 2020, Plaintiffs brought this action against Defendants Secretary Hobbs and the county recorders for all fifteen counties in Arizona, challenging the election-day deadline for correcting ballots with a missing signature. Plaintiffs allege that the deadline (1) violates the First and Fourteenth Amendments by unjustifiably burdening the right to vote and (2) denies procedural due process. They sought both preliminary and permanent injunctions requiring Defendants to grant voters who fail to sign their affidavits the same five-day or three-day grace period that

applies to ballots with perceived mismatched signatures. The district court allowed Intervenors State of Arizona, Republican National Committee, and Arizona Republican Party to intervene in defense of Arizona's existing scheme.

Pursuant to Federal Rule of Civil Procedure 65(a)(2), the district court consolidated the hearing on the motion for a preliminary injunction with a bench trial on the merits. *Hobbs I*, 485 F. Supp. 3d at 1083. The parties stipulated to the admission of 46 exhibits (with one minor exception not relevant here), but no one testified. *Id.* at 1081 n.2. In September 2020, the court ruled that Plaintiffs prevailed on both theories and granted Plaintiffs' motion for a permanent injunction. *Id.* at 1087–96.

The district court applied the *Anderson/Burdick* framework to Plaintiffs' claim that the deadline unjustifiably burdens voting rights. *Id.* at 1087–92. The court first held that the challenged election-day deadline for correcting a missing signature imposes only a "minimal" burden on voters, rejecting Plaintiffs' argument that the election-day burden was "severe" or "significant." *Id.* at 1087–88. But, the court next held, the State's proffered interests were insufficient to justify even a minimal burden on voting rights. *Id.* at 1088–92.

Turning to Plaintiffs' alternative claim that the deadline denies procedural due process, the court held that it was unclear which analytical framework applied—the *Anderson/Burdick* framework that applies to challenges to voting restrictions or the general procedural-due-process test described in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Hobbs I*, 485 F. Supp. 3d at 1093. The court declined to decide which framework applied because, in its view, Plaintiffs prevailed under either framework. *Id.* at 1093. In particular, in applying the *Eldridge* test, the court concluded

that the procedural due process claim "largely comes down to" a balancing of the burden on voters with the State's interests, an inquiry that is essentially the same as the test under *Anderson*/*Burdick*. *Id.* at 1094–95. Because of the court's earlier conclusion that the State's interests were insignificant, the court held that Plaintiffs prevailed also on their procedural due process claim. *Id.* at 1095.

Intervenors timely appealed and sought a stay pending a decision on the merits of the appeal. *Ariz. Democratic Party v. Hobbs ("Hobbs II")*, 976 F.3d 1081, 1085 (9th Cir. 2020). In early October 2020, a three-judge panel of this court unanimously stayed the district court's injunction. *Id.* at 1087. This court held that Intervenors are "likely to succeed on the merits" of the appeal. *Id.* at 1085. "As observed by the district court, Arizona's Election Day signature deadline imposes, at most, a 'minimal' burden on those who seek to exercise their right to vote." *Id.* Additionally, "though the parties dispute the magnitude of the additional burden [on the State of permitting post-election-day cures], there can be no doubt (and the record contains evidence to show) that allowing a five-day grace period beyond Election Day to supply missing signatures would indeed increase the administrative burdens on the State to some extent." *Id.* The State rationally distinguished between mismatched signatures and missing signatures: "whereas the failure to sign one's ballot is entirely within the voter's control, voters are not readily able to protect themselves against the prospect that a polling official might subjectively find a ballot signature not to match a registration signature." *Id.* at 1086. This court also held that the district court likely erred in applying the *Eldridge* test to Plaintiffs' procedural due process claim. *Id.* at 1086 n.1.

The parties filed briefs on the merits, we heard oral argument in July 2021, and we now reverse and remand.[3]

## STANDARDS OF REVIEW

When reviewing a district court's grant of a permanent injunction, "we review the legal conclusions de novo, the factual findings for clear error, and the decision to grant a permanent injunction, as well as its scope, for an abuse of discretion." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013).

## DISCUSSION

Plaintiffs challenge the election-day deadline for correcting ballots with a missing signature (A) as a violation of the First and Fourteenth Amendments and (B) as a denial of procedural due process.

## A. *First and Fourteenth Amendments*

The *Anderson*/*Burdick* framework arose out of the Supreme Court's resolution of competing constitutional commands and the practical realities of voting laws. On the one hand, "[i]t is beyond cavil that 'voting is of the most fundamental    significance    under    our    constitutional

---

[3] In our review of the merits of the appeal, we may consider *Hobbs II*, the order published by the three-judge panel that decided the motion for a stay pending appeal, because that decision "may be persuasive." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021). But *Hobbs II* "is not binding here . . . because the issues are different." *Id.* at 660. In deciding whether to stay the district court's injunction, "the motions panel is predicting the likelihood of success of the appeal. That is, the motions panel is predicting rather than deciding what our merits panel will decide." *Id.* We have reviewed *Hobbs II* for its persuasive value, but *Hobbs II* is "not binding." *Id.* at 662.

structure.'"  *Burdick*, 504 U.S. at 433 (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).  On the other hand, the Constitution assigns to the States the duty to regulate elections, U.S. Const. art. I, § 4, cl. 1, and election laws "invariably impose some burden upon individual voters," *Burdick*, 504 U.S. at 433. "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'"  *Id.* (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).  Subjecting every regulation to strict scrutiny "would tie the hands of States seeking to assure that elections are operated equitably and efficiently."  *Id.*

The Court has devised a "flexible standard" for assessing laws that regulate elections, and most laws need not meet strict scrutiny to pass constitutional muster.  *Id.* at 434.  We "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"  *Id.* (quoting *Anderson*, 460 U.S. at 789).  A law that imposes a "severe" burden on voting rights must meet strict scrutiny.  *Id.* "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'"  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 434).  "[S]tates retain broad authority to structure and

regulate elections." *Short v. Brown*, 893 F.3d 671, 676 (9th Cir. 2018).

In assessing Plaintiffs' challenge to the election-day deadline for correcting ballots with unsigned affidavits, we "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that [Plaintiffs] seek[] to vindicate." *Anderson*, 460 U.S. at 789. We "then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* We then must weigh "the legitimacy and strength of each of those interests," and we "must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).

## 1. *Burden on Voting Rights*

Plaintiffs assert that the election-day deadline for correcting a ballot with a missing signature results in disenfranchisement and, therefore, imposes a "severe" burden on voting rights. The district court rejected Plaintiffs' argument and held that "the challenged deadline imposes only minimal burdens." *Hobbs I*, 485 F. Supp. 3d at 1088. We agree with the district court. The election-day deadline for submitting a completed ballot imposes, at most, a minimal burden.

At the outset, we acknowledge that, because Arizona's law applies to all elections, including elections for President, the "state-imposed restriction[] implicate[s] a uniquely

important national interest." *Anderson*, 460 U.S. at 794–95. But we do not read *Anderson* or the Supreme Court's other cases as meaning that all state laws that affect a presidential election must meet strict scrutiny. Nor is Arizona's law an outlier. In *Anderson*, 460 U.S. at 795 & n.20, the Court considered Ohio's "stringent" early filing deadline for independent candidates and, in describing the effect of the law on presidential elections, the Court noted that only four other states had a similarly early deadline. Here, by contrast, of the 31 states that rely primarily on signature verification, 15 states effectively disallow correction of a missing signature; 4 states, including Arizona, permit correction through election day; and the remaining 12 states permit correction for varying durations beyond election day. Arizona's system for allowing the correction of missing signatures thus falls in the middle of the spectrum. In sum, although Arizona's law implicates national interests, at least when the election includes presidential candidates, this factor alone does not convince us that the burden is more than minimal or that we must apply strict scrutiny. Instead, we must analyze the severity of the burden beyond whether it applies to presidential elections.

For voters who choose to vote by mail, Arizona law requires voters to sign an affidavit attesting that the voter, in fact, cast the ballot. Ariz. Rev. Stat. §§ 16-547(A), 16-548. Plaintiffs do not challenge the signature requirement itself, which imposes only a small burden on the voter. *See, e.g.*, *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 203 (2008) (plurality opinion) (holding that a photo identification requirement imposed "a limited burden"); *Short*, 893 F.3d at 677 (holding that a requirement to register to receive a mailed ballot is an "extremely small" burden).

Plaintiffs challenge instead the deadline that Arizona long has imposed on voters who, through their own negligence only, do not sign the affidavit and thereby fail to comply with Arizona's laws for submitting a completed ballot. Most forms of voter negligence have no remedy. For example, a voter who accidentally votes for a candidate other than the voter's preferred candidate or who forgets to show up at the polls on election day cannot correct those mistakes. For voters who forget to sign the affidavit, however, Arizona law offers a measure of grace. Election officials scrupulously examine each ballot to ensure that the voter remembered to sign the affidavit and, in the event of a missing signature, officials immediately notify the voter of his or her error and offer ways to correct the error. The voter then has until election day—the same burden faced by all voters who have not yet completed a ballot—to submit a replacement ballot or a provisional ballot.

Plaintiffs nevertheless point out that, for voters who submit—at the last minute—a ballot with a missing signature, election officials may not discover the error until after the 7:00 pm election-day deadline. In that situation, the voter has no way to correct his or her mistake because the deadline has passed. Plaintiffs characterize the burden on those voters who fail to sign the affidavit and also fail to correct the missing signature by election day as "severe" because the deadline, combined with the voter's negligence, results in "disenfranchisement."

We disagree with Plaintiffs' characterization, and we agree with the district court's summary:

> Whenever voters fail to comply with a voting prerequisite, their votes are not counted and they are, as Plaintiffs use the term, disenfranchised. If the burden imposed by a

challenged law were measured by the consequence of noncompliance, then every voting prerequisite would impose the same burden and therefore would be subject to the same degree of scrutiny (presumably strict if the burden is disenfranchisement). But this cannot be true because "not every voting regulation is subject to strict scrutiny," *Pub. Integrity Alliance, Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016), and the *Anderson*/*Burdick* framework necessarily contemplates that election laws can impose varying burdens.

*Hobbs I*, 485 F. Supp. 3d at 1087–88.[4]

The Supreme Court's analyses in *Rosario v. Rockefeller*, 410 U.S. 752 (1973), and in *Burdick*, 504 U.S. 428, are instructive. In *Rosario*, 410 U.S. at 753–54, the Court addressed New York Election Law section 186, which required voters to enroll in the party of his or her choice at least 30 days before a November general election in order to be eligible to vote in the next election cycle's party primary. The petitioners failed to meet the deadline for reasons not specified in the record, which may have included "inadvertence." *Id.* at 755 n.4. The Court rejected the petitioners' characterization of the law as disenfranchising the petitioners and thereby imposing a severe burden. *Id.* at 757. "Rather, the statute merely imposed a time deadline on their enrollment, which they had to meet in order to participate in the next primary." *Id.* "[T]hey clearly could

---

[4] For that reason, the dissenting opinion's acceptance of our characterization of the burden as minimal, Dissent at 8, is inconsistent with its repeated claim that the rule in question "disenfranchises" voters, Dissent at 1, 4, 7, 9, 19, 20.

have registered and enrolled in the party of their choice." *Id.* "Hence, if their plight can be characterized as disenfranchisement at all, it was not caused by [section] 186, but by their own failure to take timely steps to effect their enrollment." *Id.* at 758; *see also id.* at 758 n.8 ("The point is that the statute did not prohibit the petitioners from voting in any election, . . . had they chosen to meet the deadline established by law.").

In *Burdick*, 504 U.S. at 430, the Court decided a challenge to Hawaii's prohibition on write-in voting. Hawaii offered several methods for putting a candidate on the ballot up to 60 days before an election. *Id.* at 435–36. The petitioner sought to cast a vote for a candidate whose name did not appear on the ballot, and he characterized his inability to vote for his preferred candidate as "depriv[ing] him of the opportunity to cast a meaningful ballot." *Id.* at 437. The Court disagreed: "any burden on voters' freedom of choice and association is borne only by those who fail to identify their candidate of choice until days before the [election]." *Id.* at 436–37. "Reasonable regulation of elections *does not* require voters to espouse positions that they do not support; it *does* require them to act in a timely fashion if they wish to express their views in the voting booth." *Id.* at 438. Accordingly, the Court concluded that Hawaii's law "imposes only a limited burden on voters' rights." *Id.* at 439.

The same analysis applies here. The relevant burden for constitutional purposes is the small burden of signing the affidavit or, if the voter fails to sign, of correcting the missing signature by election day. To the extent that the election-day deadline results in voters' not casting a vote in an election, that result "was not caused by [the election-day deadline], but by their own failure to take timely steps to

effect their [vote]." *Rosario*, 410 U.S. at 758. The deadline does not prohibit voters from voting in any election; they must either sign the affidavit at the outset or correct a missing signature by the deadline of election day. *Id.* at 758 n.8. Reasonable regulations "require [voters] to act in a timely fashion if they wish to express their views in the voting booth," and the associated burden here is only "limited." *Burdick*, 504 U.S. at 438–39.

Important to our analysis is the fact that Plaintiffs' claim does not contain an equal-protection component. Laws that "place[] a particular burden on an identifiable segment" of voters are more likely to raise constitutional concerns. *Anderson*, 460 U.S. at 792. For example, the expensive candidacy filing fees at issue in *Bullock v. Carter*, 405 U.S. 134, 144 (1972), imposed a severe burden because of "the obvious likelihood that this limitation would fall more heavily on the less affluent segment of the community." In *Anderson*, 460 U.S. at 793, the Court likewise found severe a "burden that falls unequally on new or small political parties or on independent candidates." Here, by contrast, Plaintiffs have not alleged that the burden of signing the affidavit falls disproportionately on a discrete group of voters, thereby implicating heightened constitutional concerns. To the contrary, "[f]orgetfulness is an involuntary state that any voter might reasonably experience." *Hobbs I*, 485 F. Supp. 3d at 1086 n.10. As in *Short*, 893 F.3d at 679, Plaintiffs do not argue that forgetfulness "is a proxy for some other form of discrimination—that it is a racial or political gerrymander disguised as a [neutral] distinction." Nor have Plaintiffs argued that the burden of fixing a missing signature—that is, casting a replacement or provisional ballot—falls disproportionately on a discrete group, thereby

implicating heightened constitutional concerns.[5]   The law here neutrally and nondiscriminatorily applies to all voters equally.

In sum, Arizona's requirements that a voter sign the ballot and that a voter who fails to sign the ballot has until election day to correct the voter's own mistake are reasonable, nondiscriminatory regulations that impose only a minimal burden on voting rights.

## 2.  *The State's Interests*

Because the election-day deadline imposes only a minimal burden on Plaintiffs, Arizona's "'important regulatory interests are generally sufficient to justify' the restriction[]." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).  But we must consider the "precise interests put forward by the State as justifications for the burden imposed by its rule" to ensure that those interests do, in fact, justify the rule.  *Anderson*, 460 U.S. at 789.  The State has offered several interests to justify the election-day deadline for correcting a missing signature, but we find it necessary to consider only one of them:  the State's interest in reducing administrative burdens on poll workers.

A State's interest in reducing administrative burdens on poll workers is an important regulatory interest that may justify imposing a minimal burden on voters.  *Lemons v. Bradbury*, 538 F.3d 1098, 1104–05 (9th Cir. 2008); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 634–35 (6th Cir. 2016).   Here, the State has, for decades, imposed the

---

[5]  The dissent cites sources that pertain to a potentially disproportionate effect on communities of color.  Dissent at 3–4, 19.  We emphasize that Plaintiffs make no such argument in this case, nor does the record support such a claim here.

election-day deadline on ballots with a missing signature. Plaintiffs ask us to require the State to extend that deadline for several days beyond election day.  Plaintiffs emphasize that Arizona election officials reject only a small fraction— approximately one-tenth of one percent—of the total number of ballots due to a missing signature.  Missing signatures led officials to reject 3,079 ballots in 2016 and 2,435 ballots in 2018.    Plaintiffs ask us to conclude that the added administrative burden of processing post-election cures of missing signatures does not justify the election-day deadline. We disagree.

Extending the deadline for voters to correct a missing signature indisputably would impose, as a factual matter, *some* additional burden on election officials in *all* counties. Under Plaintiffs' requested relief, but not under existing law, election officials in all fifteen counties in Arizona would have to process post-election-day attempts to cure missing signatures.  Consistent with the record in this case, Plaintiffs acknowledge that an extended deadline would impose some additional administrative burden.[6]    Plaintiffs' Response

---

[6] Properly understood, then, the parties' dispute is whether the additional administrative burden is *legally* significant enough to justify the election-day deadline under the *Anderson*/*Burdick* test.  The facts here are undisputed:  the district court considered and credited the same declarations that we consider in text.  The district court concluded that an extended deadline would impose "marginally greater administrative burdens" but found those burdens legally insignificant.  *Hobbs I*, 485 F. Supp. 3d at 1090.  The legal significance of the added administrative burden on election officials is, therefore, a mixed question of fact and law that we review de novo.  *See Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1066 (9th Cir. 1995) ("Questions of law or mixed questions of law and fact implicating constitutional rights are reviewed de novo.").  Contrary to Plaintiffs' argument to us, the district court's legal conclusions that the added administrative burden was "not significant enough to justify the challenged deadline" and not

Brief at 29 (acknowledging "a slight burden on election officials").

Secretary Hobbs declared that, given the small number of ballots with missing signatures, she "believed that county officials could feasibly implement the [extended deadline] with existing resources." She "anticipated that the [extended deadline] would not cause any *significant* increase in costs or resources." (Emphasis added.) Coconino County's Recorder similarly predicted that, because "existing staff would be able to keep up with the volume of unsigned ballots," she "would not expect any *significant* financial or other impact" from an extended deadline.[7] (Emphasis added.) The Secretary noted the support for the extended deadline by election officials in Apache County, Navajo

_____

"meaningful" enough to "justify the minimal burdens imposed by the challenged deadline," *Hobbs I*, 485 F. Supp. 3d at 1090, are not purely factual findings that we would review for clear error.

[7] Coconino County's Recorder summarized that, because of the prediction that existing staff would be able to keep up with the additional work without significant impact on the office, "I do not think that the requested post-election cure period for unsigned ballots would be a burden on my office." That summary statement clearly means only that existing staff likely would be able to handle the extra work; it does not mean that staff would not face additional work. We similarly understand the Secretary's hearsay statement that "[s]ome counties have indicated that [an extended deadline] would not cause an administrative burden at all." No election official submitted a declaration stating that an extended deadline would not cause any additional work. We acknowledge that a few counties predict that existing staff could handle the additional work, but the record contradicts any assertion that an extended deadline would not cause any additional work at all. In sum, we understand the Secretary and the Coconino County's Recorder to have used the term "burden" to describe an unmanageable amount of extra work rather than in the legal sense pertinent here, which queries, in part, whether the relief would cause additional work for election officials.

County, and Coconino County.  She acknowledged, without elaboration, that "[o]ther county officials," including Pima County's Recorder, opposed an extended deadline.

Pima County is the second most populous county in Arizona and is home to more than one million residents.  In his declaration, Pima County's Deputy Recorder acknowledged that "[o]nly a very small percentage of voters in Pima County fail to sign their early ballot affidavit."  But he explained at length why an extended deadline for correcting ballots with missing signatures would burden his office.

Election officials are busy in the days immediately following election day.  In Pima County, officials receive on election day tens of thousands of early ballots and an equivalent number of provisional ballots.  Officials must process the early ballots first, because many provisional ballots are issued to voters who receive an early ballot in the mail but nevertheless show up at the polls on election day.  Moreover, state law requires officials to process all provisional ballots within ten days after election day and, in recent elections, Pima County has completed that process on the tenth and final day.

When Pima County officials receive an early ballot with a missing signature, they do not have a procedure in place for allowing a voter to sign the original ballot; instead, they send the voter a replacement ballot or direct the voter to vote in person.  But those existing procedures would not work after election day, because a voter cannot legally submit new votes after election day.  Accordingly, election officials would have to implement a new process for allowing a voter to sign the original, unsigned ballot. Pima County's Deputy Recorder explained that the new process would be cumbersome:

> The only way [for a voter to correct a missing signature] is for the voter to travel to the Ballot Processing Center, for our staff to locate the particular ballot in the ballot room, to bring the ballot to the voter in the lobby and have them sign it. Our procedures require that two workers with different political party affiliations be present whenever a ballot is being handled. This will result in substantially more effort than occurs for a voter to confirm their [mismatched] signature. A voter can simply call our office to confirm their signature.

In sum, election officials in all counties would face some added administrative burden during a short period when officials are already busy tallying votes immediately following an election, in order to meet a deadline mandated by state law. Election officials in three counties opined that the added effort would not burden their operations significantly, because they predicted that existing staff could accomplish the task with extra effort. By contrast, Pima County's Deputy Recorder explained at length why an extended deadline would require his office to implement a new, cumbersome procedure that uses valuable staff time.

We conclude that the State's interest in reducing administrative burdens outweighs the minimal burden on the voter discussed in the previous section. The State has an important regulatory interest in reducing the administrative burden on poll workers, *Lemons*, 538 F.3d at 1104–05, and Plaintiffs' proposed relief would increase that burden in a meaningful manner. The administrative burden here is entirely unlike the situation discussed in *Anderson*, 460 U.S. at 800 & n.28, where the state imposed an early filing

deadline on independent candidates but then declined to process those applications for nearly three months.  Here, by contrast, election officials are scrambling to process all provisional and early ballots in a ten-day window, and Plaintiffs' proposed relief would require officials to expend extra effort and, in at least one populous county, to implement a new, cumbersome process during that frantic period.  Because the signature requirement and election-day deadline impose only a minimal burden on the voter, we conclude that Arizona's "important regulatory interest[]" in reducing administrative burdens on poll workers is sufficient to justify the election-day deadline for correcting missing signatures.  *Burdick*, 504 U.S. at 434.

The dissenting opinion concludes to the contrary on the ground that, had the Attorney General not "refused" Secretary Hobbs' proposal to extend the deadline for curing missing signatures, then the county recorders would have been able to implement procedures for allowing voters to cure a missing signature after election day.  Dissent at 48. The relevant inquiry, though, is not whether election officials could implement such procedures; the Constitution does not demand that all theoretically possible procedures must be put in place.  Instead, when a State imposes a minimal burden on voters through a neutral, nondiscriminatory regulation, such as casting a completed ballot by election day, the State's important regulatory interest in reducing the administrative burden on election officials generally justifies the regulation.[8]    *Burdick*, 504 U.S. at 434; *Lemons*, 538 F.3d at 1103–05.

---

[8] Additionally, we note that, whenever a government makes a choice between competing rules, it is commonplace for some political actors to have disagreed with the chosen result.  The fact that Secretary Hobbs'

Plaintiffs contend that the State has no legitimate interest in the election-day deadline because the State already allows voters, in two similar situations, to correct different flaws during the days following an election. First, after the enactment of the 2019 law, a voter now has five days (or three days if the election is not federal) following election day to correct a mismatched signature on an early ballot. Ariz. Rev. Stat. § 16-550(A). Second, if election officials reject a voter's identification documents at the polls, the voter has five days (or three days) within which to present acceptable identification to the County Recorder.

We disagree with Plaintiffs that the State's extension of a grace period in those situations means that the State also must permit voters who fail to sign the affidavit an equal cure period. Most fundamentally, the two situations described above impose a differing administrative burden on election officials. As just discussed, to correct a missing signature, Pima County would require two election officials to locate and retrieve a voter's ballot and then re-file the ballot after the voter signed the affidavit. By contrast, a voter may verify his or her signature with a short phone call to the Recorder's office, and a voter may present identification to election officials without the officials' needing to retrieve or re-file the voter's ballot. In other words, the administrative burden with respect to missing signatures is significantly greater than the short, simple verification processes with respect to mismatched signatures or unverified identifications. *See Lemons*, 538 F.3d at 1104 (holding that an administrative burden on poll workers that took "several minutes" was

preferred rule did not prevail under Arizona's procedural law because the Attorney General declined to acquiesce does not suggest that the resulting rule violates the Constitution.

"significantly greater than" the burden imposed by a similar process that took "mere seconds").

The State also has a valid reason for distinguishing between the differing categories of voters. A voter who fails to sign the affidavit has submitted an *incomplete* ballot that may not be counted. By contrast, a voter whose signature is deemed a mismatch by election officials or whose identification is rejected by election officials has submitted a *complete*, albeit unverified or provisional, ballot.

The State's distinction between the categories of voters is rational. A voter who neglects to sign the affidavit bears all responsibility for the error just as the voters in *Rosario* could not vote due solely to "their own failure to take timely steps to effect their enrollment." 410 U.S. at 758. But an early voter cannot guarantee that election officials will deem the voter's signature a "match." The Eleventh Circuit put the difference between the two categories well:

> It is one thing to fault a voter if she fails to follow instructions about how to execute an affidavit to make her vote count . . . . But it is quite another to blame a voter when she may have done nothing wrong and instead may have simply had the bad luck to have had her ballot reviewed by a particularly strict (and not formally trained) judge of signatures, and then to not have been notified of the problem until it was too late to do anything about it.

*Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1324–25 (11th Cir. 2019) (internal citations omitted);[9] *see also Hobbs II*, 976 F.3d at 1086 ("[W]hereas the failure to sign one's ballot is entirely within the voter's control, voters are not readily able to protect themselves against the prospect that a polling official might subjectively find a ballot signature not to match a registration signature.").

The State's differing treatment of voters whose identification is rejected by election officials likewise is rational. The signature requirement is simple, clearly marked, and printed prominently on the envelope in which the ballot must be placed. By contrast, the State's identification requirements, located on pages 181 to 183 of the Election Procedures Manual and posted at polling places on election day, are complex, contain several minute exceptions, and result partially from a subjective inquiry. For example, the name and address must "reasonably match" the same data in the voter's registration. A United States passport qualifies—but only if the voter also presents a second document, such as a utility bill (so long as the bill is

---

[9] The dissenting opinion cites the Eleventh Circuit's decision in *Lee* in support of its view that the administrative burden here does not justify the election-day deadline for missing signatures. But *Lee* involved a challenge to Florida's day-before-election-day deadline to cure *mismatched* signatures. 915 F.3d at 1316. *Lee*'s analysis hinged on the important differences between mismatched signatures and missing signatures and between an election-day deadline and a day-before-election-day deadline. *Id.* at 1319–21, 1324–25. Moreover, *Lee* found the particular restriction in that case to impose "at least a serious burden" on voting rights. *Id.* at 1321. By contrast, here, we agree with the district court that Arizona's election-day deadline imposes only a minimal burden on voting rights—a conclusion that the dissent questions but does not dispute. Dissent at 8.

no more than 90 days old), that contains the voter's name and address.

In conclusion, the State's important regulatory interest in reducing administrative burdens on poll workers sufficiently justifies the minimal burden on a voter to sign the affidavit or to correct a missing signature by election day.  The State rationally distinguishes between voters who neglect to sign the affidavit, thereby submitting an incomplete ballot, and voters who validly submit a completed, not-yet-verified, ballot.

## B. *Procedural Due Process*

Plaintiffs argue, in the alternative, that the election-day deadline denies voters procedural due process.  The parties dispute the proper framework for analyzing this claim. Intervenors ask us to apply the *Anderson*/*Burdick* framework, which we have referred to as the "single analytical framework" that applies to most constitutional challenges to voting restrictions.  *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011).  Plaintiffs ask us to put aside the *Anderson*/*Burdick* framework and to apply the ordinary procedural due process test articulated in *Eldridge*, 424 U.S. at 335.

We have not addressed squarely the proper framework for evaluating procedural due process challenges to a voting restriction, but two of our sister circuits have held, on review of a preliminary injunction, that the *Anderson*/*Burdick* framework likely applies.  *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 233–35 (5th Cir. 2020); *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020).  We agree with our sister circuits that "the *Anderson*/*Burdick* approach is better suited to the context of election laws than

is the more general *Eldridge* test."  *Richardson*, 978 F.3d at 234.

The Supreme Court repeatedly has assessed challenges to election laws, including election-related deadlines, under the framework now described as the *Anderson/Burdick* framework.  *See, e.g.*, *Crawford*, 553 U.S. 181 (photo-identification requirement); *Storer*, 415 U.S. at 728–46 (signature-gathering requirement for candidates); *Rosario*, 410 U.S. at 756–62 (deadline for registering to vote).  Under that framework, a State's important regulatory interests generally suffice to justify non-severe burdens on voting rights.  *Burdick*, 504 U.S. at 434.  "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  *Storer*, 415 U.S. at 730.  To the extent that the *Eldridge* test would strike a different balance, we do not think that the Supreme Court's extensive jurisprudence on challenges to voting restrictions may be discarded merely by raising the same challenge under the banner of procedural due process.

Plaintiffs do not argue that their procedural due process claim differs in some material way from their substantive claim; and they do not assert that the claim, in fact, challenges an aspect of Arizona's law other than a voting restriction.  We hold that the *Anderson/Burdick* framework applies to Plaintiffs' procedural due process claim.  As discussed above, in Part A, Plaintiffs' claim fails under that framework.

CONCLUSION

The Arizona legislature laudably amended its election code in 2019 to allow voters an extended period to correct mismatched signatures.  We hold only that Arizona's

decision not to grant the same extension to voters who neglect to sign the affidavit passes constitutional muster. But we hasten to add two observations.

First, as both the Supreme Court and we repeatedly have noted in other voting cases, the Constitution merely sets a floor. *Burdick*, 504 U.S. at 441 n.11; *Storer*, 415 U.S. at 736; *Dudum*, 640 F.3d at 1117. Nothing in our opinion should be construed as dissuading Arizona, or other States, from providing a more generous deadline than the Constitution requires. Nor should our opinion be construed as approving of the political choice made by Arizona. We are not called upon to express our political views; instead, we merely decide the narrow question before us: whether this one voting regulation violates the Constitution.

Second, we are aware of recent efforts by state legislatures to *restrict* the ability of voters to cast a ballot. This case does not concern those efforts. To the contrary, the deadline at issue in this case has been in effect in Arizona for many decades. The 2019 law made it *easier* for a different category of voters to effect their vote, but we fail to see how that law raises constitutional concerns here. *Cf. Short*, 893 F.3d at 678 (expressing doubt that "a state could convert the status quo into a burden by facilitating the process for some but not all"). To the extent that Plaintiffs argue that extending a deadline for one category of voters requires the same extension for a separate, distinct category of voters, the State rationally has distinguished between those categories. The Constitution permits, and even encourages, States to experiment by making it easier for some to vote. *Cf. id.* at 679 (noting "California's general interest in increasing voter turnout and specific interest in incremental election-system experimentation"); *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1028

(9th Cir. 2016) (en banc) (noting "our democratic federalism [is] a system that permits states to serve 'as laboratories for experimentation to devise various solutions where the best solution is far from clear.'" (quoting *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015))). In the circumstances of this case, the Constitution does not mandate that the expanded access to the ballot box be extended equally to another, distinct category of voters.

Because Arizona's law is constitutional, we vacate the injunction and remand with the instruction to enter judgment in favor of Defendants.

**VACATED AND REMANDED.** Costs on appeal to Defendants.

---

TASHIMA, Circuit Judge, dissenting:

It is a truism, but, sadly, one that needs repeating, that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Today, the majority permits the State of Arizona to undermine that right on the strength of the statement of a single county election official, whose opinion of the rule imposed by the State is contradicted by the opinions not only of other counties' election officials, but of the Secretary of State ("Secretary"), who is the State's "chief election officer." *Ariz. Democratic Party v. Hobbs*, 485 F. Supp. 3d 1073, 1082 (D. Ariz. 2020) (*Hobbs I*); *see* Ariz. Rev. Stat. § 16-452(A), (B).

The majority asserts that this case does not concern the "recent efforts by state legislatures to *restrict* the ability of voters to cast a ballot." Maj. Op. at 39. However, the State's refusal to provide a post-election cure period for ballots with missing signatures, consistent with the cure period it provides for other deficient ballots, disenfranchises voters after they cast their ballot as surely as laws that restrict voters from casting their ballots in the first place. *See Bush v. Gore*, 531 U.S. 98, 104–05 (2000) (per curiam) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008) ("The right to vote includes the right to have one's vote counted on equal terms with others.").

The majority focuses on the fact that the State has never allowed ballots missing signatures to be cured post-election. Maj. Op. at 14, 16–17. This, however, misses the point. In 2019, the State enacted legislation to allow ballots with perceived mismatched signatures to be cured up to five days post-election, consistent with the cure period provided for ballots that were cast without the voter providing proper identification. Yet, the State failed to allow a similar post-election cure period for ballots missing signatures.

The majority implies that the legislature decided to allow a post-election cure period for mismatched, but not missing, signatures in response to the allegations of the complaint in *Navajo Nation v. Hobbs*, No. 3:18-cv-08329 (D. Ariz.) (*Navajo Nation*). Maj. Op. at 15. The majority describes the complaint as alleging that "the patchwork approach for correcting *mismatched signatures* violated the constitutional rights of those persons residing in counties that imposed a stricter deadline." Maj. Op. at 15 (emphasis added).

However, the majority omits the fact that the complaint also challenged the lack of a cure period for ballots missing signatures. *Navajo Nation*, Dkt. No. 1, *cited by* Maj. Op. at 14–15. In fact, the First Amended Complaint alleged:

> Voters who fail to sign an early ballot affidavit are not given the same opportunity to cure the deficiency as voters whose early ballot has a mismatched signature and voters who fail to provide ID on Election Day. All voters should have the same opportunity to cure ballot deficiencies in order to have their ballots counted.

*Id.*, Dkt. No. 29.

The majority's decision is particularly troubling in these times of unprecedented assaults on voting rights. *See*, *e.g.*, Bertrall L. Ross II & Douglas M. Spencer, *Passive Voter Suppression: Campaign Mobilization and the Effective Disfranchisement of the Poor*, 114 Nw. U. L. Rev. 633, 635 (2019) ("The past decade has seen the proliferation of election laws designed to suppress the vote."); Nicholas O. Stephanopoulos, *Disparate Impact, Unified Law*, 128 Yale L.J. 1566, 1569, 1578 (2019) (stating that "more voting restrictions have been enacted over the last decade than at any point since the end of Jim Crow," and that "[t]hese measures amount to the most systematic retrenchment of the right to vote since the civil rights era"); *New Voting Restrictions in America*, Brennan Ctr. for Just. (Nov. 19, 2019), http://www.brennancenter.org/new-voting-restrictions-america (stating that since 2010, 25 states have enacted new voting restrictions, including strict voter ID laws, "laws making it harder for citizens to register (and stay registered)," and laws making it "more difficult to vote early

or absentee") (last visited Nov. 4, 2021).[1]  The State's excuse that the administrative burden would be too high is not supported by the record, and its other proffered reasons, which the majority does not address, do not justify the disenfranchisement of voters who fail to sign their ballots.

## I.

There are generally three types of deficient ballots:  a ballot cast by a voter who fails to bring proper identification to the polling place ("provisional conditional ballot"), a vote-by-mail ballot whose signature is perceived not to match the signature on record, and a vote-by-mail ballot missing the signature.  The Secretary explained that the issue with all three types of ballots is verification of the voter's identity.  In each case, the ballot is not counted until the voter cures the deficiency by confirming their identity.

Despite the fact that all three types of ballots are deficient for the same reason—lack of verification of the voter's identity—the State allows the first two types, but not the third, to be cured up to five days post-election.  In fact, according to the State's own expert, Arizona is the only state in the nation to have inconsistent cure periods for the different types of deficiencies.[2]  Every other state that allows

---

[1] I understand that Plaintiffs have not made a disparate impact claim. *See* Maj. Op. at 28 n.5.  These sources are merely to highlight that any limitations on voting rights must be taken seriously.

[2] The majority's characterization that Arizona's rules are in the "middle of the spectrum" and "more lenient" than other states' rules is irrelevant. Maj. Op. at 17. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (explaining that "[c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions"

voters to cure mismatched signatures post-election offers the same cure period to voters who fail to sign their ballots. *See*, *e.g.*, Cal. Elec. Code § 3019(d)(1), (e)(1)(A) (allowing ballots with mismatched or missing signatures to be cured up to "two days prior to the certification of the election"); Haw. Rev. Stat. § 11-106 (providing five-day post-election cure period for unsigned ballots, ballots with mismatched signatures, and ballots with "another condition that would not allow the counting of the ballot"); Or. Rev. Stat. § 254.431 (ballots returned "in an unsigned return identification envelope or because the signature of an elector on a return identification envelope does not match the signature" given fourteen-day post-election cure period); 410 R.I. Code R. § 20-00-23.12 (providing seven-day post-election cure period for ballots with either omitted signature or signature discrepancy).

The reason that every other state has a consistent cure period is clear. As the Secretary explained, "there is no meaningful difference between a ballot with a missing signature and a ballot with a mismatched signature" because "in both instances, the problem is that the voter's identity cannot be verified—a problem that is resolved by notifying the voter and allowing them to correct the problem and verify their identity." She further explained that forgetting to sign a ballot is "the functional equivalent of forgetting to bring identification to the polls." Yet, Arizona allows voters who fail to provide proper identification and voters whose signatures are perceived not to match signatures on record to cure those deficiencies up to five days post-election. By

---

(quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974))). Instead, the question is whether the "*precise interests* put forward by" Arizona justify its rule requiring only ballots missing signatures to be cured by election day. *Id.* (emphasis added).

contrast, a voter whose identity is not verified because he/she failed to sign the affidavit is required to cure the deficiency by election day.

## II.

We review the district court's grant of a permanent injunction for abuse of discretion, but review questions of law underlying the court's decision de novo. *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 965 (9th Cir. 2017). "'If the district court "identified and applied the correct legal rule to the relief requested," we will reverse only if the court's decision "resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.'" *Id.* (quoting *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1247 (9th Cir. 2013)).

## III.

Plaintiffs contend that the lack of an adequate cure period for unsigned ballots violates the First and Fourteenth Amendments by unjustifiably burdening the right to vote and by violating their right to procedural due process.[3]

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put

---

[3] I do not address the procedural due process claim, but agree with the district court that the State's rule violates procedural due process if traditional due process jurisprudence is applied. *Hobbs I*, F. Supp. 3d at 1092–95.

forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789).    Under *Anderson/Burdick*, therefore, we first consider the character and magnitude of the injury to Plaintiffs' constitutional rights—here, that injury is the disenfranchisement of voters who are unable to cure ballots missing signatures by election day.  The burden is the requirement to cure the missing signature by election day—a burden that is not imposed on voters who need to cure their ballots for other reasons.  The precise interest put forward by the State that the majority relies on is that the administrative burden of allowing voters to cure missing signatures within the same post-election period accorded other deficient ballots.

The question is whether the State's interests "make it *necessary* to burden the plaintiff's rights."    *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789) (emphasis added).    The State's interest in reducing an administrative burden—that the Secretary herself and other county recorders did not believe would be imposed by providing a consistent cure period—cannot be described as *necessary*.

The *Anderson/Burdick* framework has been described as a "'sliding scale'—the more severe the burden imposed, the more exacting our scrutiny; the less severe, the more relaxed our scrutiny." *De La Fuente v. Padilla*, 930 F.3d 1101, 1105 (9th Cir.) (quoting *Ariz. Libertarian Party v. Hobbs*, 925 F.3d 1085, 1090 (9th Cir. 2019)), *cert. denied*, 140 S.

Ct. 676 (2019). Even assuming that the burden is minimal, as the majority concludes, relaxed scrutiny does not mean no scrutiny. *See Tedards v. Ducey*, 951 F.3d 1041, 1066 (9th Cir.) ("[T]he burdening of the right to vote always triggers a higher level of scrutiny than rational basis review."), *cert. denied*, 141 S. Ct. 952 (2020); *Soltysik v. Padilla*, 910 F.3d 438, 445 (9th Cir. 2018) ("Ballot regulations 'that impose a lesser burden on speech rights' still must be 'reasonably related to achieving the state's 'important regulatory interests.'" (quoting *Chamness v. Bowen*, 722 F.3d 1110, 1116 (9th Cir. 2013))); *Hobbs I*, 485 F. Supp. 3d at 1092 ("[E]ven at its most deferential, the *Anderson/Burdick* framework is not a rubber stamp."). As the Supreme Court stated, "[h]owever slight that burden [on voting rights] may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)). Here, the State's provision of a post-election cure period for the other types of deficient ballots, but not for ballots missing signatures, shows that the injury of disenfranchisement placed on the rights of voters who fail to sign their ballots is not reasonably related to the State's interests.[4]

The majority relies solely on the statement of Christopher Roads, the Chief Deputy Recorder and Registrar of Voters for Pima County. Citing Roads' statement, the majority reasons that election officials are simply too busy to allow voters to cure ballots that are missing signatures

---

[4] Again, I understand this is not a disparate impact claim. The fact that the State does not impose this requirement on the other voters shows that its proffered interests are not reasonably related to the rule.

because there is no procedure in place and a new process would be too "cumbersome."[5]  Maj. Op. at 31.

The reason there is no procedure in place is that, as the State admitted in its responses to Plaintiffs' requests for admission, the attorney general refused to approve a draft of the 2019 Election Procedures Manual prepared by the Secretary that "would allow voters 'to correct or confirm an inconsistent *or missing* signature until 5:00 p.m. on the fifth business day after [an] . . . election." The Secretary's proposed draft thus instructed election officials to provide the same post-election cure period for ballots missing signatures as they provide for ballots with mismatched signatures.  Had the State followed the Secretary's direction, there would have been a procedure in place.  The State cannot refuse to implement a procedure and then claim that the administrative burden is too high because there is no procedure.   By refusing to follow the Secretary's recommendation, the State created the administrative burden it now relies on to justify its rule.

The majority misconstrues my position by stating that I think the State was required to adopt the Secretary's recommendation.  Maj. Op. at 33.  My point is not that the State should have adopted a certain procedure, but that the State cannot rely on its lack of a procedure to justify its assertion that the administrative burden is too high when the

---

**5** The majority asserts that the existing procedures to cure a ballot with a missing signature "would not work after election day, because a voter cannot legally submit new votes after election day."  Maj. Op. at 31.  But that is not the point.  Ballots cast without proper identification or with mismatched signatures are not validly cast.  All three types of deficient ballots are rejected if not cured.  Had the legislature amended the election code to provide a cure period for ballots missing signatures, there would be procedures that would work.

lack of a procedure was its own choice. The majority's assertion that the State is not required to put into place "all theoretically possible procedures" misses the point. Maj. Op. at 33. I am not advocating for adoption of a certain procedure, although the record establishes that the procedure sought by Plaintiffs is more than theoretically possible. My position is that neither the evidence nor the law supports the procedure the State did adopt.

The majority details the steps that Roads asserts would be involved if Pima County were to allow voters to cure ballots with missing signatures: a staff person must find the ballot and bring it to the lobby to be signed, and two workers must be present any time a ballot is handled. Maj. Op. at 32. To be sure, this takes at least some time, but there is no evidence of how much time—two minutes? Thirty seconds? An hour? If it takes two minutes to help a voter, it is difficult to see how the State's interest in avoiding this administrative burden is a "relevant and legitimate" interest "sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191.

It is particularly difficult to justify Roads' position because of the small number of ballots involved. Roads acknowledged that "[o]nly a very small percentage of voters in Pima County" forget to sign their ballot, and the record supports this fact. The record shows that Pima County has rejected a very small number of ballots for lack of a signature: 75 ballots in 2018, 120 in 2016, 64 in 2014, and 72 in 2012. The State's expert similarly stated that Arizona rejected 3,079 ballots for missing signatures in 2016 and 2,435 such ballots in 2018, or approximately one-tenth of one percent (0.10%) of all ballots.

Given the small number of ballots involved, the administrative burden is not sufficiently weighty to justify

the burden of requiring cure by election day, let alone the resultant injury of disenfranchising those voters.  For example, in Pima County, the 75 unsigned ballots in 2018 would result in an extra fifteen ballots a day that would need to be cured over a five-day period.  In fact, the record shows that not all voters avail themselves of the opportunity to cure, so the number of ballots involved would be even lower.[6]  In the words of the Eleventh Circuit, "it is difficult to see how—and Defendants have not shown how—a state equipped to deal with more than [2] million voters would be unduly burdened by providing the fraction of a percent [0.10%] of injured voters an opportunity to cure" ballots missing signatures in order to have their votes counted. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1322 (11th Cir. 2019).[7]

Roads' declaration is the only evidence in the record that supports the conclusion that offering a consistent post-election cure period would impose an administrative burden on the State.  In contrast to Roads, Patty Hansen, the Coconino County Recorder, declared:

> Because we already have staff on hand to call
> voters and notify them of signature mismatch

---

[6] In Mohave County, 40 of 82 voters remedied unsigned ballots in 2018, and 4 of 9 did so in Santa Cruz County.

[7] The majority points out that *Lee* involved mismatched, not missing, signatures.  Maj. Op. at 36 n.9.  Regardless, the reasoning applies here.  Because the number of ballots involved is so small, the State has not shown that it would be unduly burdened by applying a consistent cure period.  The majority also distinguishes *Lee* on the ground that a voter who fails to sign a ballot is responsible for the error. I discuss whether fault is an appropriate consideration below.  *See infra* pp. 55.

issues for five days after an election, and because we already have Post-Election ID Verification Sites set up and staffed for five business days after an election, we would not need to hire additional staff to administer a five business day post-election cure period for unsigned ballots. The proposed five business day post-election cure period for unsigned ballots could be administered in tandem with and would use the same processes as the five business day signature match and provisional conditional ballot processes. Our existing staff would be able to keep up with the volume of unsigned ballots we typically receive on Election Day, based on my 33 years of experience. I therefore would not expect any significant financial or other impact on my office if we provided a five business day post-election cure period for unsigned mail ballots.

Hansen further stated, "I do not think that the requested post-election cure period for unsigned mail ballots would have any impact on the timing of certifying election results since my office already must wait five business days after an election for provisional conditional votes and signature matching issues to be resolved."

The Secretary similarly stated that "statewide uniform procedures for curing early ballots with missing signatures would not impose a significant burden on county election officials, because all counties already were required to employ a post-election cure period for mismatched signatures and conditional provisional ballots." The Secretary also stated that an additional cure period for ballots

missing signatures "would not cause any significant increase in costs or resources." She explained that some counties indicated that the additional cure period "would not cause an administrative burden at all. For example, election officials in Apache County, Navajo County, and Coconino County . . . have indicated that they would prefer to adopt the Additional Cure Period." She further expressed her belief that "county officials could feasibly implement the Additional Cure Period with existing resources."

Roads' declaration does not establish that a consistent cure period would impose an administrative burden, particularly in light of the rest of the evidence in the record. I therefore conclude that the district court's finding that the State's interest in reducing its administrative burden does not justify the State's rule, *Hobbs I*, 485 F. Supp. 3d at 1090, is not clearly erroneous.

That the State's rule is not relevant to its interests is made particularly evident when the State's other proffered interests are considered: fraud prevention, orderly administration of elections, and promoting voter participation and turnout. The evidence not only contradicts the State's assertion that the administrative burden is too high, but it establishes that a consistent post-election cure period would *further* the State's other asserted justifications for *not* providing the cure period.

Hansen stated the following in her declaration:

> [T]he requested post-election cure period for unsigned ballots would promote the orderly administration of elections. Since, in my experience, voters do utilize the pre-election cure period to resolve unsigned ballots received by my office before Election Day, I

am confident that the proposed post-election cure period would increase the number of lawfully cast votes that are counted.

Similarly, the Secretary stated that "adopting uniform cure procedures would benefit Arizona's voters by reducing voter confusion and by ensuring that eligible voters are not excluded from the democratic process simply because they forgot to sign their name or misunderstood the instructions on their ballots." She further stated that "including the Additional Cure Period for ballots with missing signatures would 'achieve and maintain the maximum degree of correctness' by increasing consistency across the counties and ensuring that more eligible voters' ballots are actually counted in the election." In support of her position that an additional cure period would benefit Arizona voters, the Secretary cited her statutory duty to "'prescribe rules' in the Elections Procedures Manual 'to achieve and maintain the *maximum degree of correctness, impartiality, uniformity and efficiency* on the procedures for early voting and voting.'" (Citing Ariz. Rev. Stat. § 16-452 (emphasis added).)

There is no evidence that the State's rule requiring ballots missing signatures to be cured by election day furthers its other three proffered justifications. Instead, the statements of both Hansen and the Secretary establish that a consistent cure period for all deficient ballots would promote fraud prevention, orderly administration of elections, and voter participation and turnout by "increas[ing] the number of lawfully cast votes that are counted," "reducing voter confusion," and "ensuring that more eligible voters' ballots are actually counted in the election." *See*, *e.g.*, *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 412–13 (6th Cir. 2020) (Moore, J., dissenting) (reasoning that

Tennessee's asserted interests in orderly elections and counting only eligible votes would be furthered by the plaintiffs' requested cure period for signature verification); *Lee*, 915 F.3d at 1322 (concluding that Florida's interest in combatting voter fraud was not furthered by "depriving legitimate vote-by-mail and provisional voters of the ability to cure the signature mismatch, thereby disenfranchising them"); *Frederick v. Lawson*, 481 F. Supp. 3d 774, 796 (S.D. Ind. 2020) ("[P]roviding mail-in absentee voters notice and the opportunity to cure a perceived signature mismatch by confirming their identity in fact *promotes* these important governmental interests" in "preventing voter fraud and maintaining election integrity"); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018) ("[T]he Court does not understand how assuring that all eligible voters are permitted to vote undermines integrity of the election process."); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 220 (D.N.H. 2018) (concluding that New Hampshire's interests in preventing voter fraud and protecting public confidence in elections would be furthered by additional procedures, such as allowing voters to cure ballots rejected for perceived signature mismatch).

The State's assertion that its interest in promoting voter participation and turnout is furthered by refusing to allow voters the same post-election time period to cure their ballots as other voters would be laughable if the stakes were not so high. The right to vote "is regarded as a fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Therefore, "[h]owever slight" a burden is placed on that right, the burden "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (quoting *Norman*, 502 U.S. at 288–89). Here, the State's proffered justifications for the

burden imposed by its rule requiring only ballots missing signatures to be cured by election day are not furthered by the rule.  Quite the opposite—allowing a consistent post-election day cure period would further its interests.

The only proffered interest that is rationally related to the lack of a consistent post-election cure period is the administrative burden, which is the only one the majority addresses.  As discussed above, that administrative burden is supported only by Roads' statement, which is contradicted by Hansen, the Secretary, and the Secretary's statement that election officials in Apache County and Navajo County preferred to adopt a post-election cure period for ballots missing signatures. *See Hobbs I*, 485 F. Supp. 3d at 1090 (stating that the court "assigns great weight to the Secretary's judgment, given her position as Arizona's chief election officer and corroboration from these [Apache, Navajo, and Coconino] county officials").

The State also justifies its rule on the ground that voters who fail to sign their ballots are at fault.  *See* Maj. Op. at 35 (reasoning that a voter who forgets to sign the affidavit "bears all responsibility for the error").  However, voters who fail to bring proper identification to the polls are similarly at fault.  This is why the Secretary characterized forgetting to sign the ballot as the "functional equivalent" of forgetting to bring proper identification.  The State's provision of a post-election cure period for voters who fail to provide identification shows that a voter's fault is not relevant to the State's rule denying a post-election cure period for voters who fail to sign the ballot.

Some voters forget to bring proper identification to the polls or misunderstand the instructions regarding proper identification documents, resulting in the need to cure their ballots.  Similarly, some voters forget to sign their ballots or

misunderstand the instructions on the mail-in ballot. In fact, the complaint in *Navajo Nation* asserted that "[o]ver seventy percent (70%) of the voting age population on the Navajo Indian Reservation . . . speak a language other than English," which "resulted in the Tribal Members' inability to read and understand the instructions for casting an early ballot." *Navajo Nation*, Dkt. No. 1. Because both types of voters are similarly at fault, it is clear that fault is not relevant to the State's rule.

The extra few minutes a day it would take to allow approximately 75 voters, and more likely fewer than that, to cure their ballots at a site already being operated and staffed by election officials surely cannot justify the complete disenfranchisement of those voters. Hansen stated that her county would not need to hire additional staff to administer a five business day post-election cure period for unsigned ballots, and other election officials stated that the additional cure period would not cause any administrative burden, The single, contrary statement by Roads certainly does not establish that the State's rule is "necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). Disenfranchisement is too great an injury to constitutional rights to be justified by the assertion of this purported administrative burden, particularly because elections can be decided by a very small number of votes. *See*, *e.g.*, Cherish M. Keller, Note, *Re-Enfranchisement Laws Provide Unequal Treatment: Ex-Felon Re-Enfranchisement and the Fourteenth Amendment*, 81 Chi.-Kent L. Rev. 199, 199 (2006) ("In 2000, George W. Bush gained Florida's Electoral College votes by a margin of 537 popular votes."); Shadman Zaman, Note, *Violence and Exclusion: Felon Disenfranchisement As A Badge of Slavery*, 46 Colum. Hum. Rts. L. Rev. 233, 242 (2015) (stating that Washington's 2004 gubernatorial election was

decided by 129 votes); Domenico Montinaro, *Why Every Vote Matters - The Elections Decided By A Single Vote (Or A Little More)* (Nov. 3, 2018), https://www.npr.org/2018/11/03/663709392/why-every-vote-matters-the-elections-decided-by-a-single-vote-or-a-little-more (last visited Nov. 4, 2021) (stating that "there have been more than a dozen races decided by a single vote or ending in a tie over the last 20 years"); Reid Wilson & Brandon Carter, *Dem appears to win recount in key Virginia House race by single vote* (Dec. 19, 2017), https://thehill.com/homenews/campaign/365664-dem-appears-to-win-recount-in-key-virginia-house-race-by-single-vote (last visited Nov. 4, 2021).

The majority characterizes my conclusion that the State's irrational, unsupported rule is part of the recent assault on voting rights as "inaccurate." Maj. Op. at 17. This unsupported accusation is but further confirmation of the majority's ostrich-like approach. It hides its head in the sand and refuses to grapple with the facts. The State's rule is "another drop in the bucket that is the degradation of the right to vote in this country." *Hargett*, 978 F.3d at 418 (Moore, J., dissenting). Like Judge Moore, I lament the fact that, by this opinion, our court joins the "many federal courts—more specifically, many federal courts of review—[that] have sanctioned a systematic effort to suppress voter turnout and undermine the right to vote." *Id.* at 417 (Moore, J., dissenting).

Our democracy is weakened by any limitations on the right to vote, especially when the proffered justifications for the restrictions are so flimsy. The State has offered no rational explanation for requiring ballots missing signatures to be cured by election day, given the five-day post-election cure period for correcting other similar mistakes. Because

"the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

•   ●   •

I would affirm the district court, whose decision to grant the injunction was thoughtful, considered, and supported by substantial evidence in the record.  I therefore respectfully dissent.